The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the 4th Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Mr. Gerken. Thank you, Your Honor. May it please the Court. One month after this Court vacated a prior authorization the Fish and Wildlife Service gave to the Atlantic Coast Pipeline, Can you either speak up or move the mic? Certainly, Your Honor. Thank you. The agency quickly reauthorized the decision under tight timelines. In its haste to restart construction that had been paused after the Court issued its decision, the agency ignored and failed to take account for new data confirming that this project will jeopardize the survival of two species, the rusty-patched bumblebee and the club-shell mussel. For two other species, the agency reissued without correcting the errors identified by the Court or introduced new errors. Courts do not defer to agency decisions that ignore important data, contradict the record, or violate the law, but that's exactly what happened here. And the agency's approach to the rusty-patched bumblebee, I think, summarizes that. With regard to the rusty-patched bumblebee, you didn't challenge the jeopardy determination in prior proceedings, did you? No, Your Honor, we did not. So how does that impact what we're considering today? Well, as I said, there is new information. Since the Court vacated the 2017 biological opinion, at that time, the state-of-the-art, what the agency disclosed in its biological opinion, was that there was one bee identified in the area. To this day, no one, not the Fish and Wildlife Service, not FERC, not Atlantic Coast Pipeline, has deliberately surveyed for this endangered species in the path of the pipeline. But Virginia Wildlife Agency, of its own initiative, surveyed across the state of Virginia and found nine bees in the area of the pipeline. So that is new information that, by law, the agency is required to take into account. In fact, it should have reinitiated consultation to reopen this decision and evaluate it. That population of nine bees is significant, and it's important to put it into context. The agency concedes, there is no doubt, that every remaining population of this critically imperiled bee is essential for its survival, including this one. That is not in dispute. It is also clear that a population, a small population documented by only nine bees, is not healthy. In reaching a contrary conclusion, the agency ignored its own best available science. As summarized in its listing decision and a status assessment report, here's what that tells us. First, the remaining populations of the rusty patch bumblebee are rapidly disappearing. At one point, the agency thought there might be as many as 100, but it concedes that 70% of those locations have not been confirmed by observation of a live bee since 2015. Second, the small populations that remain are very small. Most are documented by fewer than five bees. The biggest known is documented by 30 bees, and this is important. The agency concedes in its status assessment that those numbers, surveys of five to 30 bees, are not indicative of healthy colonies or populations. A healthy population, in theory, includes tens to hundreds of nests, each with thousands of bees. And while a survey for bees is not a census, in a status assessment, the agency concedes this. When we're talking about this rusty patch bumblebee, you've got four of these different species here. Yes, sir. And it seems to me your argument, I mean, there's a lot packed there, but it really just comes down to the fact that you're saying that the agency's jeopardy analysis rested on the assumption that this particular bee was not present outside of this particular model they had. And, in fact, your data now shows there were bees present outside of that model. And so your point, as I understand it, is that that report now needs to address that discrepancy. Yes, sir. Is that the end of the story in terms of what you're seeking? That is, absolutely, your honor. And that is half of the two significant, one of the two significant errors they made. So, absolutely, they assumed that this population is thriving, yet entirely confined to this discrete computer-modeled high-priority zone. And we have a real-world experiment showing that that's wrong, because they made the same assumption based on the observation of one bee in the 2017 biological opinion. But now we have new data showing that's wrong. And rather than revisit that assumption, they just drew a bigger circle and repeated it. So once they are confronted with what you just said, new data says that bees are outside, but it doesn't show it. And now you say they should address the discrepancy. Why would they say we should not? They have committed, what they say is, our approach, and they have this guidance document, Section 7 guidance document, which was developed by the same authors at the same time. This is a newly listed species, so they're working this out as they go. It says, well, we take this computer model. There's only 100 populations potentially around the country. We can't survey for the bee for every single project across its historic range. This bee is now down to 1,100th of 1% of its former habitat. So that's their approach for figuring out, well, where do you start looking? But we don't need that approach to know to look here. They found the bee on accident, admittedly, and we know that it's bigger, not because they looked, but because Virginia did, so they should have revisited. And that's one of two assumptions. The other is also very significant, Your Honor. This population is on the brink, and they can see it. It's necessary for survival. What the agency said, it's the best available science, is that those survey numbers should be proportionately reflected in the individual bumblebees observed in surveys. Meaning if it's a healthy population, you expect to see a lot of bees when you survey. And nine, like five to 30, is not indicative of a healthy population. The agency ignored that statement from its status assessment at page 49 of the joint appendix. And the data about this particular population with only nine bees instead relied on these studies it pulled from the literature. All these species are important, of course, from an ecological perspective. But the bee has really gotten a lot of attention nationwide and worldwide. I mean, as compared with the club shell and the Indian bat and the isopod here. But when you look at it, and each one of these has a different analysis, I understand. And I think you kind of laid out where the rest of the patch bumblebee hid. With regard to the club shell, that was an arbitrary and capricious determination there. And it just seems to me that if they present this evidence that the population would not be jeopardized for survival, that would be sufficient. Yes, Your Honor. But again, they have to update their analysis to account for new information. So as of the time they issued their 2017 biological opinion, the state of the art, as described by the agency, was that there were 19 club shell mussel expected to be surviving approximately in this small population in Hackers Creek, West Virginia, which is one of the last 13 populations known worldwide. But we have new information. In the intervening year, a salvage effort was conducted.  And it estimates that another 100 are left there. It also says that the good habitat, which previously they thought was around 600 meters, extends 7.5 kilometers upstream. Here's how the malacologist, the mussel scientist who did that work, summarized it. He said the population appears to be stable, and this bodes well for the future outlook of the species in Hackers Creek, since we know that water quality is not the limiting factor influencing it. It's important to remember what's not in dispute. There's no question that this project is going to wipe out this population. The incidental take statement authorizes that, authorizes them to kill all the remaining club shells. Is it in dispute that the Hackers Creek population is not reproducing? Not reproducing. The latest data, they say that they have found no evidence of reproduction. And because of that, they say that we – Is that in dispute? What's in dispute, Your Honor, is not what the data shows, but what the significance of it is. The agency has taken an approach with this population that it has done nowhere else. It has said – with the bee, they said, this is a small and vulnerable population, but we're going to assume away the impacts, and so the species is going to be fine. With the club shell, they did the opposite, and something the Endangered Species Act flatly prohibits because this population is vulnerable. They say – and they don't dispute. If it blinks out, it will jeopardize survival of the species. But because they've accepted that as inevitable, they can let the Atlantic Coast Plan come in and do it now, excel that process. And the Endangered Species Act, it prohibits that. And it's accepted that where the baseline condition already jeopardizes the species, an agency cannot take action that deepens it. This is contrary – What about the biop that noted that this population was at least more intensive and broader, so therefore it would be more likely that you could find them outside of this area? That's right, Your Honor. And also, the juveniles – What about it? I know it's right. So I can't repeat the question, Your Honor. I may have misheard you. Can you repeat the point? I mean, if the report shows that it's broader and it's more likely to be found outside, why is it not of significance here? Oh, it absolutely is, Your Honor. And the juvenile – they say they found no juvenile mussels confirming this, but they're the hardest to find. They're small. They know they're hard to find. The record documents that. But even – let's take their presumption as a given. Let's say that there's no evidence now that it's reproducing at this time. These mussels live a long time. In another recent GAS project, a biological opinion from the NISOS project, which is in the Supplemental Administrative Record at page 2,236, the same species lead, the mussel biologist that's their lead for this, said this about a small population there documented by only a few scattered individuals. He said, even small, apparently non-viable populations could begin to reproduce after a number of years and are potentially important components in the conservation of the species. In that biological opinion, because the species population was small and on the brink of blinking out, the agency required the project to be redrawn to eliminate all effects of that small population. They took the exact opposite approach, the approach required by the Endangered Species Act. When you know a population is on the brink and loss of that population will jeopardize the species, something they don't even dispute. You don't abandon it. For Rusty-backed bumblebee and the club-shell mussel, the agency erred twice by ignoring new data that should have led it to reevaluate its assumptions. For the Indian abat, it made a different error. It abandoned information it already had in hand and the conclusions it had already reached. In its 2017 biological opinion, the agency concluded that the majority of effects to this species, to the Indian abat from construction of the Atlantic Coast Pipeline... So the review is whether it's arbitrary or capricious? Yes, Your Honor. And the question is whether the record provided a basis upon which it could determine that this particular bat did not use its suitable occupied summer habitat. Yes, and previously, Your Honor, they had concluded that it would and that construction of the pipeline tree clearing would kill Indiana bats as a result because they migrate through, they use it as travel corridors. And so it reversed that decision. So the question is, does the record support that reversal? They offer only two reasons. First, they say they got new survey data confirming that what they call unoccupied habitat really is unoccupied, but that is not accurate. As of the time, the 2017, the previous biological opinion was issued, their summer habitat surveys were complete in West Virginia and 99.4% complete in Virginia. This is not new information. The two biological opinions cite the exact same data. What's more, the agency knows that information isn't exactly right. They have defined survey protocols for how you figure out whether bats are present. You can do this with either an acoustic survey or what they call a misnet. You trap the bats and count them. They have positive acoustic detections at 17 locations in this supposedly unoccupied habitat across the corridor for Indiana bat. Atlantic didn't like the results, and they said, let us go back and try it again with misnet surveys. Now, the Fish and Wildlife Service staff writing this opinion contacted the expert, who wrote those survey guidelines and did the statistics, and she said, once you have a positive acoustic hit, we cannot negate it by conducting misnet surveys. That's in the supplemental administrative record at page 10,130. But under pressure in November 2016, they relented. So this is reflected in the 2017 biop. You've got just a minute or so. Can you tell us why the biological report you think is not satisfactory insofar as the Madison Cave isopod? Absolutely, Your Honor. This is the simplest of the four. They simply failed to correct the error the court identified. The court vacated the prior biological opinion because the agency failed to offer a reasoned connection between the 2,000 acres of Madison Cave isopod habitat that's in the right-of-way of the pipeline and the small spot they were regulating its take around Cochran's Cave. They offer one new fact to explain that change. They point to the fact that they say, as Fish and Wildlife Service describes in its brief, an analysis of average groundwater depth in Augusta County, and they provide a link to a web page maintained by the U.S. Geological Survey. That's wrong for two reasons. First, they know, the biological opinion documents, that just because the pipeline is only eight feet underground, the heavy equipment, the blasting, the trenches will affect isopod up to a half mile away by shaking those rocks, releasing sediment, and smothering them. So that difference in depth doesn't matter. But just as importantly, when you follow that link and look at the new data they're citing, it's not average analysis of groundwater depth in Augusta County. It's the average over time of groundwater at one well near U.S. 613 in Virginia. They know that there are areas where groundwater is shallower than 20 feet. Cochran's Cave they describe as a groundwater upwelling or groundwater surface. The record also documents a spring where isopod are present. At page 63 of the joint appendix. In fact, everywhere a groundwater spring emerges, that's groundwater at the surface, coming out of the ground. The Atlanta Coast Pipeline will cross 157 of those springs in Augusta County. So the new data they cite does not support their conclusion, and it is not accurately characterized in their brief, Your Honor. So they have failed once again to provide a reasoned explanation for why, despite 2,000 acres of habitat impact, they're only regulating take and requiring minimization around one small spot, around Cochran's Cave. Unless you have further questions for me. Thank you. Mr. McArdle. Good morning. I'm Kevin McArdle of the Department of Justice on behalf of the service, and may it please the Court. Petitioner's main theory on the bumblebee is that we ignored new data, gathered by the Virginia Department of Conservation and Recreation. That's incorrect. We accounted for that new data. The record shows that we took the new data, we applied our model to it, and we modeled a new high-potential zone that accounts for all of the available survey data. So that's incorrect. So you're saying the observation data that was alluded to here did, in fact, was accounted for in constructing that model? Absolutely. These are nine bees we're talking about that were found outside of it? Some of them were found outside of the original HPZ that was modeled on the basis of one observation in the same area. You're saying that the biological report addresses that discrepancy? Yes. It accounts for the new observations. What the model does is it predicts the movements of bees away from an observation point based on foraging distances and based on habitat around the observation point. I thought the report was the whole basis of the Jeopardy analysis was that the bees did not exist outside of the model. The model provides— And then they found that, in fact, there were some bees. That seems to be the simple thing that seems to be argued here from me. Maybe I got that wrong. At least they are contending that the model started out and says, no, we're going to assume there's nothing out here. It didn't go out there and, I guess, forage around and look. I don't know how you do it scientifically other than use your eyes and look and saw some bees. It says, oh, there's some bees here. Therefore, they said, well, your report doesn't account for those bees. The model doesn't say that no bees exist outside the HPZ. What the model does is predict the likely areas of bee presence based on— I think you just said the same thing. You just said the model says it assumes there are no bees outside, right? It predicts the areas of likely occurrence. And you know what? So a word assumes does not work for predict. Is that right? I don't want to get mixed with words. I'm just trying to understand your position. When you document a bee, you have to figure out what that means for the population. You can't just draw a little arbitrary circle around the observation. You have to predict what the observation means for the presence of the species. And that's what the model does. It takes actual, real-world data, not assumptions, and then predicts areas of likely bee activity based on dispersal distances, which the petitioners don't dispute, and surrounding vegetation types. Here's the thing. At any point in time, that model is the only methodology available for predicting areas of likely activity based on actual occurrence data. The only other option is to get out your magic marker and draw a circle. How is the increased number of queens determined by the service? Well, the service independent of this project went out to an expert, Dr. Evans, University of Minnesota, and said, we're trying to predict how many queens on average. And she provided her best guess as an expert. Actually, what she said was, all I have is a wild guess. And then she said. And what you all said is that it was her best guess. She said, all I have is a wild guess based on what I've seen in other captive and retrieved colonies. And then she comes up with a number. A range would be zero to approximately 100. And so then she just splits the difference, I guess, 20 to 40, and then you all picked 30 as in between. And she also says, right before that, I mean, her expertise is laid out in a four-line email at JA929, where in addition to saying it's just a wild guess, she says, it's likely that they didn't produce queens as that is pretty common. That's what you based it on. Her expertise is based on her experience. No, but is it based on is the services increase in number of queens to 30 based on this email from Dr. Evans? It's based on two things. It's based on that email from an expert who's independent, and it's based on two studies of a closely related species that experts in the field frequently rely on. When I asked you, okay, it's based on this wild guess by Dr. Evans. No, it's based on her best estimate. It's based on her best estimate as an expert. She doesn't say best estimate anywhere in this. She says a wild guess. And then she provides a range. Let's see, it's estimate in here. No, the word estimate is not in here, and the word best is not in here. And the range is 0, 0 to approximately 100, and then she guesses, okay, then 20 to 40. It's an informed guess as an expert who's worked with the species, and we didn't rely exclusively on that. We relied on two studies for a closely related species where her estimate fits right in that range. Okay, but when I asked you the question, your first response was the expertise of Dr. Evans, and this is it right here. That's one of the two things that are listed at JA 1124 that the agency relied on. It would be inappropriate to only rely on one of them, and her expertise comes from her experience in the field working with the species. I'm not saying she's not an expert. I'm saying a wild guess is not scientific. It's an informed guess. It's not the only thing we relied on, and there is absolutely nothing that we didn't consider coming up with that estimate. Why didn't you conduct a survey to determine that these bees were there? Two reasons. First, we have a framework that was developed independent of this project to decide when consultation is required in the 28-state range where the species resides, and that's the HPZ model. And what our guidance says is that when a project intercepts, overlaps with an HPZ, the project proponent has two options, survey the area of overlap or assume species presence, and that's what we apply here, that exact framework that we apply in every other case, no special accommodations for ACP. And the other reason is we had survey data. We had a wealth of survey data that the Virginia Department of Conservation and Recreation gathered during the summer of 2018 with funding that we provided, and that data, in their own words, they said they undertook a huge survey effort, including over 80 days of surveys. And you know what they found? The only population in the vicinity of the project was in the same location as the 2007 HPZ. It provided additional data points, additional observations in that same area, but it confirmed that that is the area of concern for this project. And then we did what we were supposed to do as biologists. We took that data into account, modeled a new HPZ, and did our analysis on that basis. And if new data comes along down the road, the ESA accounts for that by providing for reinitiation and consultation. The statutory framework works as it's written. We render our opinion on the best available data, and if new data comes up, as it always does in science, science is evolving, then we reinitiate. So what do we make of the fact that these bees were, in fact, found outside of this identified model here? And the question is whether there's a factual basis to believe in any revision of that model when you know that there's a population outside of it. The model is based on where the bee is found. And it's always possible that there will be more detections. The service doesn't just keep coming. But I don't quite understand why you wouldn't do a survey just to ensure at least the baseline observation data that's put into that model. Why wouldn't you do a survey just to find out? We had survey data. But you didn't have a survey that did that kind of thing. You didn't turn up this information. You didn't turn up any bees with it. Well, Virginia did with the surveys they conducted with money from the service. They found the bees, and we took that into account. Remember, it doesn't tell you. It tells you, okay, now we know there are bees there. It doesn't tell you there are not bees even outside of that. No, but we have a bee that has a range, a historic range of 28 states. So we have to make a judgment for federal agencies. We can't have consultation on every project in 28 states, and we can't order anybody to do surveys. So what we did is come up with a rational methodology that uses the best available occurrence data, independent of this project, to identify areas of likely occurrence. And that model is continually updated as new observations become available. And then, if there's an overlap, then we engage in consultation, and the guidelines specify when surveys are required. It seems to me that the Virginia survey, wasn't that, did that thing have anything to do with the Atlantic Coast Pipeline? I mean, the survey, they didn't do it for that purpose. No, it was much broader than that. It wasn't limited. It seems to me if you did one for that purpose, you might turn up something a little bit more specific. But the possibility that you, you're not going to, we can't order every project in 28 states to do a survey on the possibility that you might find a bee. Those surveys that Virginia did, they were more extensive than limited to the pipeline right-of-way. They were better. They were designed to find, are there any populations in these areas where they've been detected before? And they found bees in the exact same area that we used in the 2017 file. They confirmed that that's the area of concern. And there's another factor here, too. The services view that HPZs provide a reasonable prediction of the likely areas of occurrence is consistent with the logic of the listing rule, why we listed the species in the first place. And that's at JA502 because other folks came in and said, you can't list this species. You haven't surveyed the entire range. The response to comment two. And we said, we have enough data. We're required to make our listing decision on the best available data. And we have a rational basis for concluding that the species range has contracted. And that rational basis is after the proposal for the listing, when this became a concern, massive survey efforts were undertaken in several states, and very few observations were documented. If you will, because your time is leading, the Madison Cave isopods probably interest me more so. The blasting and this trenching, the evidence shows it would loosen this subsurface rock there. Why does that not at least establish that the effects of this trenching will go below the so-called 20 feet that you have there? In the Cochran's Cave conservation site, they will. And that's why the service concluded that take is likely in that area. Outside Cochran's Cave, the service concluded that take is not likely to occur for two reasons. First, the groundwater on average is 20 feet below the surface. And this is what the record addressed? That is the harm that would be attributable to this loosening of the subsurface rock? In other words, does the record address that? Yes, the record, the biop describes the potential harms from ground disturbing activities. What was the additional analysis that the service did on the isopod after remand with regard to the causal nexus? Yeah, the court said that the service didn't provide a rational explanation for why take was limited to the 11.2 acres in Cochran's Cave. And we provided that explanation. At Cochran's Cave, you have a cave complex. So you didn't do any additional analysis? You provided the explanation of what you did in the first place? We provided the missing explanation that the court said was missing. Outside of Cochran's Cave, the two factors are the groundwater is 20 feet below the surface and the limit of project disturbance is eight feet. Now, the project can still affect isopod through features like open throat sinkholes. But the KARS Protection Plan provides adequate mitigation measures to protect those features outside of Cochran's Cave. It won't be sufficient in Cochran's Cave because that's a complex cave area with a phreatic upwelling. But outside, the service found that those measures would be sufficient. And the KARS Protection Coordinator for Virginia reached the same conclusion at JA701. And the Virginia Department of Conservation and Recreation also reached that conclusion at JA633. So the agency had a rational basis for concluding that outside of Cochran's Cave, take is not reasonably certain to occur because of the location of the groundwater and the measures in the KARS Plan. And that's why they properly didn't include those activities in the ITFs. Unless the court has any questions, my time is up. Thank you. Mr. Smith. Thank you, Your Honors. May it please the court. My name is Brooks Smith on behalf of Intervenor Atlantic Coast Pipeline. Your Honors, the overriding imperative, I believe, that everyone in this room shares is to give the benefit to the species. The question is how best to do that.  To give the benefit of the doubt to the species. The service is required by its regulations to use the best data available. But there is a fail-safe in those regulations. The discovery of new data, new sightings of bee, the detection of a Madison Cave isopod, the discovery of bat and suitable unoccupied summer habitat, all of those are immediate triggers for the reinitiation of consultation. That is how the Endangered Species Act consultation process works. You use the best data available to you, and you revise, if needed, based on new data. I would like to address a couple of the questions that have been raised for other counsel. First, the Dr. Evans email. Your Honor, Judge Thacker, I think it's important to note that that email was in December of 2017. That was before any appeal of the first biological opinion or incidental take statement. It was done in connection with the service's effort to develop Section 7 consultation guidance for the Rusty National Park. So then where is her opinion that was relied on for this new buyout? Well, it's manifest, Your Honor, in the August 2018 draft, Section 7 implementation guidance, which is at JA1123. So she said something different than this? Her opinion is based on raising colonies and observing colonies in the wild. Which is what she says in this email? Yes, Your Honor. It is fundamentally the same conclusion. My point is that this was not – Oh, did you say it's fundamentally the same conclusion? The same conclusion based on our observations, yes, Your Honor. The point is that this was not an AC-specific endeavor. This was to deal with a newly listed species, to come up with Section 7 consultation guidance that could be applied range-wide, nationwide, to help establish recovery goals for the rusty patch bumblebee. Your Honor, Judge Wynn, you raised questions about the Madison Cave Isopod and what was done after the vacator and remand in August of 2018. As you heard from Mr. McArdle, the – There seemed to be an indication that the report now accounts for the harm that can come from that blasting or trenching even beyond the 20 feet. It does indeed, Your Honor. The key feature in this 1,974-acre landscape of potential habitat for the isopod, which has never been detected in this area, is this Cochrane's Cave Complex, which is a large cave complex with ceiling heights upwards of 70 feet, where the construction impacts from the project will cut through the cave. There are no avoidance and minimization measures that will prevent the potential for sedimentation to enter the phreatic upwelling stream and get into the habitat. That's precisely – But you are representing that this report accounts for the blasting outside of the area. Well, that's exactly – so the focus was on Cochrane's Cave because of – I'm talking about the area of the cave now. Correct. And once in the cave, it can extend outward 0.5 mile, which is established by prior successful projects. The reason that the service did not extend that habitat surrogate to the rest of the 1,974 acres is the two factors that you've heard. One, the difference between the construction impact zone, blasting, trenching, grading, everything necessary to put in a pipe, is 6 to 8 feet from the surface, and the groundwater depths in this county are 20 feet and below. And we know from the experts in the field on Madison Cave Isopod that they live in the subsurface water below the groundwater deep. That's one. The other, importantly, is that the avoidance and minimization measures, the required conservation measures in the FEIS, in the biological opinion for the project, are shown to be effective to deal with other karst features, not like this massive cave complex. Those avoidance and minimization measures include proven, established protocols for having karst experts in the field, for having things like graded filters to prevent sedimentation from entering into sinkholes, for immediate notification to all of the resource agencies, federal and state, if there is any potential for sedimentation to enter into a karst feature or sinkhole that would cause a take that was not contemplated by the service in the incidental take statement. So you're saying the sinkholes, are they also protected by the mitigation measures? Yes, Your Honor. The other sinkholes that have been identified, which are not a revelation, they are identified in a table in the final environmental impact statement from July of 2017. All of those have associated avoidance and minimization measures that have been proven effective. They are endorsed by the state resource agencies. They were adopted by the Fish and Wildlife Service in the biological opinion. There's nothing in the record to suggest that they will be ineffective at minimizing the potential for take outside of the Cochran's Cave complex. So make sure I understand this. The basic intention on the other side seems to be, if you're blasting six feet down, that loosens rock and falls down 20 feet or so, that's when you're going to hit the home of the isopods down there and it could harm them. And you're saying no.  First, that difference in the construction zone and the groundwater zone, which has also been applied. It's not a novelty of the Atlantic Coast Pipeline. It was applied to another project in Warren County that was revealed in the supplemental record at Jay. I'm sorry. Supplemental administrative record 1743. All of these approaches have been established based on prior successful projects. So the depth of groundwater versus the depth of construction and the success of the avoidance and minimization measures. I will say in my remaining minute, with respect to the Indiana bat, that the fail-safe here is that the service did exactly what this court admonished them to do, which is avail themselves of the existing data on bats and to establish a numeric take limit. That numeric take limit of two bats is project-wide. It does not differentiate habitats such that suitable unoccupied summer habitat is somehow excluded from the take trigger. The other habitats that are where bats were identified were factored into the surrogate for additional monitoring purposes. But the two-bat take limit is project-wide. And lastly, Your Honor, with respect to the club shell, as you said earlier, the salvage effort was far more extensive than any survey work that's been done in the 25 years of long-term monitoring of Hacker's Creek. It involved over 30 hours of salvage recovery effort by qualified, approved biologists. And that's why the numbers are different. Thank you, Your Honors. Thank you. Mr. Gehrke, you have some time reserved. Please. First, addressing the comments about the Rusty Patch bumblebee, there's a fair amount of discussion about the high-priority zone. And as described, this works. They say, well, draw a circle everywhere a bee is observed. But it's important to remember how the record documents how thoroughly everyone stuck their head into the sand to avoid observing a bee. The first bee was discovered on accident while searching for other insects. And while counsel represents that the money from the Fish and Wildlife Service funding the DCR to go out and look, no one asked them to do that. They did that because they have generalized funding to protect endangered species from the Fish and Wildlife Service, and they went out and surveyed statewide and happened to find some near the pipeline corridor. No one has yet surveyed the pipeline corridor where we know there is a bee population. The other point that I heard made was that... What do you mean no one has surveyed? I thought I heard them say they had conducted some surveys or had data analysis. No, sir. That is not accurate. They had done a habitat survey. Are they required to survey? The Endangered Species Act does not relieve the agency, FERC, or Atlantic from the obligation to generate best available data, including surveys. We cited several legal citations in our brief, including legislative history of the act and case decisions underscoring that. You said they did a habitat survey. What is a habitat survey? After the initial bee was found, a contractor went out and spent about a day looking for floral resources to inform the computer model, how it would work. No one has done a survey for the bees, has looked for the bees in the area, and that is undisputed. What about the isopod? What opposing counsel said about what they've done with regard to the isopods and how that won't be a take or a harmful take? Counsel represented that mitigation outside Cochran's Creek will prevent all takes, but that's flatly contradicted by the biological opinion, which says, avoidance and minimization measures will not be completely effective at preventing crushing and trapping of Madison Cave isopod. That's at page 1,217 of the Joint Appendix. They also suggest that Cochran's Cave is somehow unique. This is a window, some spot where sediment will get into the groundwater and migrate a half mile away to affect the species. But the record contradicts that as well. Counsel said that we have a karst plan. We'll avoid sinkholes. But at page 1,103 of the JA, you can see a list of those sinkholes, and six that they acknowledge will not be avoided under that karst plan. They're going to blast the pipeline right through them. Those, like Cochran's Cave, are windows where sediment from blasting and trenching will get in. Also, the biological opinion of the record confirms that it's not just blasting and trenching for the pipeline. The record says all ground-disturbing activities, road construction, operation of heavy equipment, will shake sediment loose and risk smothering pipelines. There's no road construction happening at Cochran's Cave. They acknowledge that the ground-disturbing activities throughout this habitat have potential to take in the Madison Cave isopod. That reference to ground-disturbing activities is at page 1,202 of the JA. For India and a bat, counsel represented that there's a numeric take limit, two bats, and that protects the bats because it applies project-wide. The problem is this. When they accounted for the take from that habitat before, they projected more losses than two, more dead bats than two. They've now taken that out, and we'll never know because they're not required to monitor for the take of bats in the unoccupied suitable habitat because in the new biological opinion, they presume no impact. And so they're not looking. They're not doing avoiding minimization. They're not monitoring. They're not monitoring the amount of the habitat impact. If they cut more trees than projected, nothing limits them from doing that. So that two-bat protection, that limit of killing two bats, does not protect India and a bat. And that habitat that they call unoccupied, but they know bats use, they travel through as documented by 17 acoustic surveys in 2016. Unless you have further questions for me. Thank you, counsel. We'll come down and greet counsel and proceed to our next case. Thank you.
judges: Roger L. Gregory, James A. Wynn Jr., Stephanie D. Thacker